**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**INTERTAPE POLYMER CORP.,**
          **Plaintiff,**

**-vs-**                                                       **Case No. 6:09-cv-289-Orl-31GJK**

**INSPIRED TECHNOLOGIES, INC.,**
          **Defendant.**
_____

# ORDER

This matter came before the Court without oral argument upon consideration of Defendant-Counterclaimant's, Inspired Technologies, Inc. ("ITI"), Motion for Preliminary Injunction (the "Motion") (Doc. 22), the exhibits and declarations attached thereto, Plaintiff-Counter-Defendant's, Intertape Polymer Corporation ("Intertape"), response in opposition to the Motion (Doc. 27), and the declaration attached thereto.

## I. Background

ITI is the exclusive owner of the "Frog Tape" and "Paint Block" brand names and trademarks (Doc. 22-2, ¶ 3). "Paint Block" is a special polymer, similar to that used in disposable baby diapers, which absorbs and retains large amounts of liquid relative to its own mass (Doc. 22-2, ¶ 4). ITI has applied its patented "Paint Block" polymer to the edges of painter's grade masking tape to create its "Frog Tape" – a product that is more resistant to paint leaks and seepage than ordinary painter's tape (Doc. 22-2, ¶¶ 5-6).

On January 15, 2008, ITI entered into a Supply Agreement with Intertape (Doc. 2 at 8-20). Pursuant to Sections 1.2 and 2.1 of the Supply Agreement, ITI agreed to purchase all of its paper

masking tape for use in creating its "Frog Tape" from Intertape (Doc. 2 at 8). According to ITI, however, Intertape repeatedly shipped defective tape to ITI in violation of the quality and warranty provisions of the Supply Agreement (Doc. 22, ¶ 3). Most of the product Intertape manufactured for ITI, however, does not appear to have been defective (Doc. 27-2, ¶ 6). Rather than simply waste the defective product, the parties amended the Supply Agreement to authorize Intertape to remove the cores[1] from the defective tape rolls so that Intertape could sell the rejected tape (Doc. 22-2 at 21). More specifically, the parties agreed that:

> Intertape shall be authorized to de-core these products and replace the cores with no-name or generic cores. This product may then be sold on such terms and conditions as Intertape deems appropriate, so long as such sales are into markets outside of the United States, with product not knowingly coming back into [the United States] or Canadian markets. ITI acknowledges that such de-coring and resale shall not violate ITI's intellectual property rights, or the terms and conditions of the Supply Agreement and Intertape is hereby authorized to take such actions as it deems necessary in connection with such products.
>
> (Doc. 22-2 at 21).

In its instant Motion, ITI contends, *inter alia*, that Intertape has breached the amended Supply Agreement by selling rejected but de-cored masking tape in the United States or by selling the rejected masking tape without de-coring its "Frog Tape" trademark in the United States (Doc. 22 at 2). Accordingly, ITI moves this Court to enter a preliminary injunction that would prohibit Intertape from making any further sales of rejected masking tape in violation of the amended Supply Agreement and would mandate that Intertape repurchase all of the rejected masking tape it has already sold in violation of the amended Supply Agreement (Doc. 22 at 23-24).

---

[1]Because these cores contained ITI's "Frog Tape" trademark and the words or company logo "Inspired Technologies," ITI required Intertape to remove these cores before selling any of the defective product.

In support of its Motion, ITI attaches the declarations of David Wagner, ITI's President (Doc. 22-2); James Rowland, a former sales representative for ITI (Doc. 22-3); Jay Hall, the General Manager of South Shore Partners, a company that purchases overstock or rejected tape (Doc. 22-4); and Charles Mervin, the Director of The Cause USA, a non-profit company that purchases large amounts of tape in connection with its business (Doc. 22-5).

According to ITI's President, "Intertape sold defective masking tape rolls into the [United States] marketplace without removing the cores of the defective masking tape rolls and replacing them with 'no-name or generic cores'" (Doc. 22-2, ¶ 48). More specifically, ITI's President avers that "Mr. Jay Hall told me that Global Surplus Distributors, Inc. had purchased (3) truckloads[2] of FROG TAPE 'second' (rejected tapes)" (Doc. 22-2, ¶ 49).[3] Notwithstanding this hearsay statement, neither ITI's President nor Mr. Hall identify from whom Global Surplus Distributors, Inc. putatively purchased these truckloads of tape.

Mr. Rowland avers that he "was told by the manager, Brian Fochman, of Gill-Roy's hardware store in Port Huron, Michigan, about a purchase of rejected (seconds) FROG TAPE by Intertape" (Doc. 22-3, ¶ 3). "Specifically, the manager told me he was at a job site and saw a box of 'green tape' that was not in canisters, contrary to how it is sold by ITI" (Doc. 22-3, ¶ 4). Furthermore, "Mr. Fochman further told me that the contractor/customer on the site was

---

[2]According to ITI's President, one truckload of "Frog Tape" contains, at a minimum, approximately 41,000 rolls of tape (Doc. 22-2, ¶ 50).

[3]ITI's President further avers that Global Surplus Distributors, Inc. actually purchased eight (8) truckloads – not three – of "Frog Tape" (Doc. 22-2, ¶ 49). The basis for these additional truckloads is an unauthenticated, hearsay email attachment that was received by Charles Mervin from John Dilberti of Global Surplus Distributors, Inc. (Doc. 22-2, ¶ 49). The email attachment is discussed further, *infra*.

convinced he was buying 'FROG TAPE' that was manufactured by Intertape" (Doc. 22-3, ¶ 5). Again, notwithstanding the foregoing hearsay and even double hearsay statements, neither Mr. Hall nor the manager identify from whom the tape was purchased.

Mr. Hall avers that while he was attending a trade show in Las Vegas, "two individuals told me that they had purchased rejected (seconds) of FROG TAPE" (Doc. 22-4, ¶ 3). One of these individuals was John Dilberti of Global Surplus Distributors, Inc. (Doc. 22-4, ¶ 4). According to Mr. Hall, John Dilberti told him that he "had three (3) truckloads of FROG TAPE seconds" and was "looking for an outlet" in which to sell the tape (Doc. 22-4, ¶ 4). The second individual whom Mr. Hall spoke to at the trade show was Tom Goebel of Tapes Unlimited. Tom Goebel told Mr. Hall that "he had purchased seven (7) truckloads of FROG TAPE seconds" (Doc. 22-4, ¶ 6). Again, notwithstanding the foregoing hearsay statements, neither Mr. Hall, John Dilberti nor Tom Goebel identify from whom these truckloads of tape were purchased.

Finally, according to Charles Mervin, John Dilberti told him that Global Surplus Distributors, Inc. had "green painters' tape"[4] to sell and that this tape had been purchased from Intertape (Doc. 22-5, ¶ 7). After an initial telephone call, Mr. Mervin avers that Mr. Dilberti emailed him a "Green Tape Inventory" document, which bears the name of Global Surplus Distributors, Inc. (Doc. 22-5, ¶ 10 and at page 9). According to this email attachment, Global Surplus Distributors, Inc. had on hand 484,000 rolls of "Private label product – FROG TAPE – Inspire technology" that it was offering for sale in various sizes and at various prices (Doc. 22-5 at 9). After reviewing the email and attached inventory document, Mr. Mervin swears that he

---

[4]Living up to its name, ITI's "Frog Tape" is green in color.

requested a sample of the tape and that the next day Mr. Dilberti offered to send him a sample but that Mr. Dilberti stated: "FYI – the core will have to be removed as Frog does not want their name on the tape if it is not sold by them." (Doc. 22-5, ¶ 14). On or about April 1, 2009, Mr. Mervin received the sample from Mr. Dilberti and took pictures of the sample tape (Doc. 22-5, ¶ 15). The pictures, which are attached to Mr. Mervin's declaration, clearly indicate that ITI's brand name "Frog Tape" and the words "Inspired Technology" are in the cores of the sample tape received from Mr. Dilberti (Doc. 22-5 at 12). However, Mr. Dilberti provided the samples to Mr. Mervin free of charge, notwithstanding Mr. Mervin's request to buy the samples (Doc. 22-5 at 7). Furthermore, even though Mr. Mervin specifically swears that he requested to purchase the tape from Mr. Dilberti after receiving the samples (Doc. 22-5, ¶ 17), there is no evidence that Mr. Dilberti or Global Surplus Distributors, Inc. ever made the sale (or for that matter, any other sales). In its response, Intertape acknowledges that it is contractually prohibited from selling any of the rejected masking tape in the United States or Canada (Doc. 27 at 3). Indeed, Intertape contends that it has never sold any of the rejected masking tape – de-cored or otherwise – in the United States or any other market, and that ITI has failed to produce any admissible or concrete evidence to the contrary (Doc. 27 at 3). In support of this contention, Intertape attaches the declaration of its Senior Vice President, Joe Tucci (Doc. 27-2). Mr. Tucci oversees "all aspects of the Supply Agreement," is "directly involved in Intertape's relationship with ITI," and has access to and has reviewed "Intertape's production and inventory records which provide a complete description [of] all products manufactured for ITI, all products shipped to ITI, all products accepted or rejected by ITI, and all products originally produced for ITI, but sold to parties other than ITI (if any)" (Doc. 27-2, ¶ 3).

Having reviewed Intertape's business records, Mr. Tucci avers that these records "confirm that Intertape has not sold any tape manufactured for ITI to any person or entity over than ITI" (Doc. 27-2, ¶ 6). More specifically,

> Production records indicate that 2,314,059 rolls of tape have been produced for ITI (bearing the FROG TAPE[] branded core). Sales records indicate that 1,810,337 rolls of tape have been sold to ITI. Intertape inventory records indicate that a total of 493,104 rolls of tape either [sic] returned to Intertape by ITI or awaiting [sic] shipment to ITI pursuant to a pending order. There is a discrepancy of 10,618 rolls between these totals, which indicates an inventory accuracy of > 99.5%.

(Doc. 27-2, ¶ 6).

Mr. Tucci also avers that, although Intertape has not sold any "Frog Tape" branded product to anyone other than ITI, it has nevertheless "provided a total of approximately 400 rolls of Excess Product to Intertape employees Ken Rogers and Susan Sorbo" (Doc. 27-2, ¶ 9). These employees have been tasked with seeking out an international market for selling the tape that ITI has rejected and, on at least one occasion, these employees have provided free samples of the rejected tape to third parties – a practice that Mr. Tucci swears "is typical in the sales negotiation process" (Doc. 27-2, ¶¶ 9 and 11).

Finally, Mr. Tucci avers that Global Surplus Distributors, Inc. is not an Intertape customer and that Intertape has never sold any products to Global Surplus Distributors, Inc. (Doc. 27-2, ¶ 11). Nevertheless, Intertape's employee, Susan Sorbo, has apparently communicated with John Dilberti and provided him free samples of rejected tape (Doc. 27-2, ¶ 11). However, as with other free samples Intertape has made available, Intertape expressly informed Mr. Dilberti that any rejected tape would have to be de-cored and sold outside of the United States and Canada (Doc. 27-2, ¶ 11).

## II. Jurisdiction, Venue and Choice of Law

Intertape is a Delaware corporation with its principal place of business in the State of Florida. Intertape is therefore a citizen of the State of Delaware and the State of Florida. ITI is a Minnesota Corporation with its principal place of business in the State of Minnesota. ITI is therefore a citizen of the State of Minnesota. Intertape's Complaint alleges that the damages in this case exceed $75,000.00 (Doc. 2, ¶ 21). Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

The parties' Supply Agreement contains an unambiguous venue and choice of law provision providing for venue in "the appropriate state or federal court located in Orange County, Florida" and selecting "the laws of the State of Florida" as the governing law to be applied in construing the Supply Agreement (Doc. 2 at 14). Neither party has contested the applicability of this provision. Accordingly, the Court concludes that venue is proper in this Court and that Florida substantive law applies to the Supply Agreement.

## III. Standard of Review

To be entitled to a preliminary injunction, a party must clearly show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm an injunction may cause the nonmovant; and (4) that granting the injunction is not adverse to the public interest. *See*, *e.g.*, *Winter v. Natural Res. Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008) (citations omitted); *Church v. City of Huntsville*, 30 F.3d 1332, 1341-42 (11th Cir. 1994) (citation omitted).

"It goes without saying that an injunction is an equitable remedy" that should only issue where the intervention of a court of equity "is essential in order effectually to protect property

rights against injuries irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-312 (1982) (citations and quotations omitted). Indeed, a preliminary injunction, in particular, is "an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the 'burden of persuasion' as to each of the . . . prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Furthermore, the granting of a preliminary injunction is "the exception rather than the rule," and the movant must clearly carry the burden of persuasion." *Id*. (citation and quotation omitted).

Nevertheless, the Court need not find that the "evidence positively guarantees a final verdict" in the movant's favor. *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). And at "the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Id*. (citation and quotation omitted).

**IV. Analysis**

To demonstrate its likelihood of success on the merits, ITI must carry its burden of persuasion on either its trademark infringement claim, breach of contract claim, or its unfair competition claim (Doc. 22 at 12-13). As ITI correctly notes, for purposes of analyzing a motion for preliminary injunction, Courts have often found that these sorts of claims are interrelated (Doc. 22 at 12, citing, *e.g.*, *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002). However, as ITI appears to concede, all three claims rest on the fact that Intertape has sold or "is selling green tape that it had manufactured for ITI to sell as FROG TAPE[] brand tape, but that ITI had rejected as defective" (Doc. 22 at 16). Accordingly, ITI

-8-

asserts, as it must, that Intertape has sold defective tape in the "United States' market place, including, in Michigan, Illinois and Tennessee, with 'Inspired Technologies' and 'Frog Tape' in [the tape rolls'] cores" (Doc. 22 at 16).

Upon review, however, there is simply no competent evidence that Intertape has ever sold any of the rejected tape. Even assuming, *arguendo*, that the Court found ITI's hearsay evidence "appropriate given the character and objectives" of the instant motion, *Levi Strauss & Co.*, 51 F.3d at 985, which the Court does not so find, at best that evidence suggests that some third parties may have attempted to sell rejected tape – not that Intertape ever made such sales. On the contrary, at most Intertape appears to have made 400 free sample rolls of the rejected tape available for the limited purpose of finding an appropriate international market in which to sell the rejected tape. Where Intertape has made those free samples available to third parties, it has done so with the express caveat that the tape must first be de-cored and then sold only in markets outside of the United States and Canada. This is clearly consistent with the parties' Supply Agreement. Furthermore, Intertape's business records clearly show that only a little more than 10,000 rolls of rejected tape, out of a total of some 2.3 million rolls produced by Intertape for ITI, are unaccounted for in Intertape's inventory. These 10,000 rolls fall well short of the "truckloads" or 484,000 rolls of tape that ITI's hearsay and unauthenticated evidence would suggest have been improperly put into the marketplace.

In short, ITI has failed to carry its burden of demonstrating a likelihood of success on the merits. Because ITI has failed to establish this threshold element, the Court need not analyze the remaining three elements necessary for ITI to establish its entitlement to a preliminary injunction.

**V. Conclusion**

For the foregoing reasons, it is **ORDERED** that Defendant-Counterclaimant's, Inspired Technologies, Inc. ("ITI"), Motion for Preliminary Injunction (Doc. 22) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 23, 2009.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE