# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**INTERTAPE POLYMER CORP.,**

    **Plaintiff-Counterdefendant,**

-vs-                                          Case No. 6:09-cv-289-Orl-GAP-GJK

**INSPIRED TECHNOLOGIES, INC.,**

    **Defendant-Counterclaimant.**

## ORDER

This matter came before the Court without oral argument upon consideration of Plaintiff-Counterdefendant's, Intertape Polymer Corporation ("Intertape"), Motion for Partial Summary Judgment (the "Motion") (Doc. 41), Defendant-Counterclaimant's, Inspired Technologies, Incorporated ("ITI"), response in opposition thereto (Doc. 62) (the "Response"), and Intertape's reply (Doc. 65).[1]

**I. Overview**

Intertape is, *inter alia*, a supplier of masking tape. ITI was the manufacturer of "Frog Tape," a painter's tape product consisting of masking tape and ITI's patented "Paint Block" – a polymer that, when applied to the edges of masking tape, absorbs paint to produce cleaner lines and edges.

On January 15, 2008, Intertape and ITI entered into a contract (the "Supply Agreement")

---

[1] Intertape has also moved for summary judgment on ITI's counterclaims. (Doc. 43). The Court will address that motion by separate order.

whereby ITI agreed to purchase its requirements of masking tape from Intertape for the next two years. In September 2008, however, ITI licensed its "Paint Block" technology to a third-party, Shurtape, and granted Shurtape the exclusive right to manufacture and market "Frog Tape" in the United States, Canada and certain parts of Europe. When Intertape learned that Shurtape was manufacturing "Frog Tape" for ITI without using masking tape supplied by Intertape, it brought suit against ITI.[2] (Doc. 2).

Intertape brings two claims in its Complaint. Count I asserts that ITI breached the Supply Agreement by entering into the license agreement with Shurtape. (Doc. 2, ¶¶ 20-30). Count II asserts that ITI breached its duty of good faith and fair dealing by entering into the licensing agreement with Shurtape. (Doc. 2, ¶¶ 31-36).

In its Motion, Intertape contends that it is entitled to a judgment as a matter of law as to ITI's liability on Counts I and II of the Complaint.[3] (Doc. 41 at 1).

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 29 at 7). The parties' Supply Agreement is governed by Florida law. (Doc. 2 at 14).

## II. Undisputed Facts

### A. The Supply Agreement

The Supply Agreement was formed after arms-length negotiations between two commercial parties.

Section One provided:

---

[2] Shurtape is not a party to this litigation.

[3] Intertape concedes, however, that there are disputed issues of fact as to its damages and therefore seeks summary judgment only as to ITI's liability for breach. (Doc. 41 at 1).

1.1     ITI and Supplier wish to establish a business relationship in accordance with the terms and conditions of this Agreement whereby [Intertape] will, in accordance with ITI's specifications set forth on <u>Exhibit A</u>, which is attached hereto and incorporated herein, produce, package, [and] store for a reasonable time, paper masking tape (the "Products" [sic][4]), at agreed upon pricing.

1.2     ITI acknowledges that it may only purchase its requirements of the Products from Supplier provided the Supplier has the capacity and the Products have the functional characteristics required by the specifications. ITI shall not manufacture or produce, or contract for the manufacture, production, or purchase of identical Products with any party other than [Intertape] during the term of this Agreement or any renewal thereof and agrees [Intertape] will be its single source for the Products so long as Supplier is in compliance with pricing, quality and warranty provisions of Section 4 and 6 below . . . .

1.4     (a)     Prior to the commencement of each calendar year during the Term of this Agreement, the parties shall establish benchmarks for the purchase of the Products for each month during the upcoming calendar year.

       (b)     During each monthly period during the term of this Agreement, ITI shall purchase from [Intertape] and [Intertape] shall sell to ITI the Products ordered by ITI pursuant to Section 3 hereof.

(Doc. 2 at 8).

Section Three, in turn, required ITI to provide Intertape with rolling forecasts of its demand for tape:

3.1     On a monthly basis, ITI shall provide [Intertape] with a twelve (12) month rolling forecast with respect to its then current estimate of the monthly requirement for the Products.  Such forecast shall be provided at the end of each month during the Term hereof.  If ITI's orders would cause the total quantity ordered during the month to exceed the applicable monthly forecast for the Products, then [Intertape] agrees to exert reasonable efforts to comply with such additional demand, if demand is not met ITI may procure Product from additional supplier.

3.2     ITI agrees that each time it gives [Intertape] a rolling twelve (12) month forecast, it is making a firm commitment to purchase at least the quantities of the Products specified for the first three (3) months of such forecast. [Intertape] will rely

---

[4]The only type of product referenced in the Supply Agreement is "Green 21-Day Interior Professional Masking Tape."  (Doc. 2 at 15).

upon this commitment in ordering raw materials and packaging supplies needed to manufacture the specified quantities of the Products and in manufacturing the Products.

3.3  Subject to the terms and conditions of Section 1.4, the fourth through twelfth months of each monthly rolling forecast are a non-binding estimate for the planning purposes only, subject to a rolling revision either upward or downward on subsequent twelve (12) month rolling forecasts.

(Doc. 2 at 9).[5]

Finally, Section 9 of the Supply Agreement provided:

9.  <u>Conduct</u>.  During the Term of this Agreement, the parties shall not conduct themselves in a manner which is detrimental to the other.  Each shall conduct itself in accordance with the rules and regulations of such jurisdiction as may be applicable.

(Doc. 2 at 12).

With the exception of two oblique references to "Frog Tape" in the product name and color specified in Exhibit A, nothing in the Supply Agreement indicates that the masking tape supplied by Intertape would be used by ITI to produce Frog Tape or that the Frog Tape manufactured by ITI would need to contain Intertape's masking tape.  Furthermore, Section 6.2 of the Supply Agreement expressly disclaimed "ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."  (Doc. 2 at 11).

**B.  Additional Background**

George Gruber received a patent for "Paint Block" in December 2004 and assigned same to ITI in January 2007.  *See* U.S. Patent No. 6,828,008 (filed May 3, 2002) and assignment history *available at* 2004 WL 2800293.  The parties executed the Supply Agreement on January 15, 2008.  (Doc. 2 at 1).

---

[5]There are no minimum or maximum requirements specified in the Supply Agreement.  Furthermore, Intertape has not cited to any evidence concerning ITI's monthly forecasts in its Motion.

Within the first three months of the Supply Agreement, Intertape and ITI became increasingly frustrated with each other's ability to perform.[6] As a result, Intertape began developing a product of its own ("Bloc-It") to compete with Frog Tape.[7] (Docs. 62 at 5; 57-3). In July 2008, however, Intertape also began making overtures to ITI regarding a possible joint venture or buy out. (Doc. 62 at 6).[8]

As a part of the negotiations for a joint venture or buy out, Intertape requested certain proprietary and confidential business information from ITI (including, *inter alia*, customer lists, distribution channel documentation, market studies, competitor analyses, sales information, pricing information, and profit information).[9] (Doc. 40 at 26).

By September 2008, negotiations for a joint venture (or buy out) collapsed and, on December 16, 2008, ITI issued a press release announcing the formation of a patent and trademark

---

[6]ITI contends, for instance, that Intertape repeatedly shipped defective rolls of tape "with dirt caked onto the edges of the tape, rolls with protruding cores, loosely wound rolls, [] rolls with metal shavings around their edges. . . . rolls with torn cores, rolls with peeling liners, and rolls that were contaminated with black stains and oil." (Doc. 62 at 4) (citations omitted). For its part, Intertape disputes that contention and notes that, notwithstanding its adherence to the product specifications in Exhibit A of the Supply Agreement, it consistently put up with ITI's rejection of putatively defective goods by accepting their return or fully crediting ITI's account. (Doc. 41 at 5); (Doc. 62 at 4).

[7]Intertape eventually completed its development of "Bloc-It," but it is unclear when Intertape began actively marketing and selling same. Intertape contends that "Bloc-It" was not marketed until more than six months after ITI entered into its licensing agreement with Shurtape. (Doc. 41 at 10).

[8]ITI contends that Intertape's development of a competing product was deliberately designed to decrease the value of ITI and to coincide with Intertape's subsequent "low-ball" offer to buyout ITI at a time when Intertape knew ITI was "strapped for cash." (Doc. 62 at 6-7).

[9]On July 22, 2008, the parties entered into a separate confidentiality agreement which provided that the information requested by Intertape and provided by ITI would be kept confidential and used only for the purpose of evaluating the possible acquisition of ITI. In one of its counterclaims, ITI asserts that Intertape breached the confidentiality agreement by using ITI's business information to develop "Bloc-It." (Doc. 40 at 26-28).

license agreement with Shurtape[10] for the "exclusive rights to manufacture and market award-winning Frog Tape in the United States, Canada, and parts of Europe."[11] (Doc. 2 at 18). The following day, Intertape sent written notice to ITI of its alleged breach of Section 1.2 of the Supply Agreement and sought assurances that ITI would cure the breach and retract its statements in the press release. (Docs. 41 at 6; 42 at ¶10). When ITI refused to do so, Intertape brought suit.

It is undisputed that Shurtape does not use masking tape supplied by Intertape to manufacture "Frog Tape."

**III. Applicable Law**

    **A. Summary Judgment**

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from

---

[10] Pursuant to the license agreement, Shurtape acquired an exclusive license to ITI's patents and trademarks and the right "to manufacture, have manufactured, distribute, use, and sell [Frog Tape throughout the United States, Canada, Germany, Belgium, the Netherlands and Luxembourg]." (Doc. 58-9 at 4).

[11] ITI and Shurtape executed the license agreement on September 10, 2008. (Doc. 58-9 at 1). Intertape, however, did not became aware of the agreement until the date of the press release (i.e., December 16, 2008) and it is unclear when Shurtape actually began manufacturing "Frog Tape." (Docs. 41 at 6; Doc. 42 at ¶9).

the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

**B. Contracts**

In Florida, there are three elements to a breach of contract claim: (1) a valid contract; (2) a material breach; and (3) damages. *See*, *e.g.*, *Technical Packaging, Inc. v. Hanchett*, 992 So. 2d 309, 313 (Fla. 2d DCA 2008); *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1210 (M.D. Fla. 2002). While every contract contains an implied covenant of good faith and fair dealing under Florida law, a breach of this covenant – standing alone – does not create an independent cause of action. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). To recover on a claim for the breach of the implied covenant of good faith and fair dealing,

a party must prove, *inter alia*, that an express term of the contract has been breached. *Snow v. Ruden, McCloskey, Smith, Schuster & Russell*, 896 So. 2d 787, 792 (Fla. 2d DCA 2005); *see also* FLA. STAT. § 672.311 (imposing duty of good faith in contracts for the sale of goods where contract "leaves particulars of performance to be specified by one of the parties").[12]

## IV. Discussion

### A. Count I – Breach of Contract

Intertape contends that by "entering into the License Agreement pursuant to which Shurtape would manufacture . . . FROG TAPE[], ITI breached the 'single source' provision of the Supply Agreement (Supply Agreement § 1.2)."[13] (Doc. 41 at 9). The Court disagrees.

On its face, the plain and unambiguous language of Section 1.2 of the Supply Agreement obligated ITI to "only purchase its requirements of [masking tape] from [Intertape] . . . ." and prohibited ITI from "manufactur[ing] or produc[ing], or contract[ing] for the manufacture,

---

[12]Neither party cited to or applied the Uniform Commercial Code (the "UCC") in this case. The Court is therefore reluctant to discuss or rely upon the UCC to the extent there may be gaps in the Supply Agreement (which is, of course, a contract for the sale of goods). In any event, the Court notes in passing that the UCC's provisions governing requirements contracts suggest that, when an enterprise is sold, goes out of business or otherwise no longer requires the goods specified, "the question may arise whether the buyer is bound by an existing output or requirements contract. That question is outside the scope of the this Article, and is to be determined on other principles of law." FLA. STAT. ANN. § 672.306, cmt. 4 (current through June 30, 2010).

[13]Intertape also contends that ITI breached the Supply Agreement by failing to provide Intertape with letters of credit. (Doc. 41 at 9). That assertion, however, is not alleged in the Complaint and even if it were, Intertape has not adduced evidence that it suffered any damage as a result of ITI's failure to timely provide letters of credit. While Intertape has conceded that there are disputed issues of fact as to damages, it still bears of the burden of establishing *some* damage as an element of its claim. *See*, *e.g.*, *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239 (M.D. Fla. 2003) (granting summary judgment where party failed to establish damages on its breach of contract claim and noting that "[d]amages are a necessary element in an action for breach of contract"). Furthermore, the undisputed facts demonstrate that ITI paid all of Intertape's invoices in full. (Doc. 62 at 10) (citations omitted).

production, or purchase of identical [masking tape] with any party other than [Intertape] . . . ." (Doc. 2 at 8).

It is undisputed that ITI is the owner of the patent for "Paint Block" – the essential difference between ordinary painter's tape and Frog Tape. When ITI licensed "Paint Block" to Shurtape on an exclusive basis, ITI ceased to be a manufacturer of Frog Tape and its requirements for masking tape went to zero (at least as to those markets where Shurtape was granted an exclusive license to manufacture and sell Frog Tape). Nothing in the parties' Supply Agreement prohibited ITI from utilizing its intellectual property (i.e., its patent) in this way[14] or obligated a third party such as Shurtape to continue purchasing tape from Intertape. Furthermore, nothing in the parties' contract specified that ITI's requirements for masking tape were expressly tied to the manufacture of "Frog Tape." Although Intertape may have understood this to be the case, such a material term easily could have been included in the Supply Agreement. It was not. Instead, Intertape disclaimed any warranty of fitness for a particular purpose and permitted ITI to provide it with rolling forecasts of its requirements for tape. No minimum requirement was specified.[15] Provided its forecasts were in good faith, ITI could have had no future requirements for tape and not been in breach of the Supply Agreement. Finally, on its face, ITI's licensing agreement with

---

[14]*See, e.g.*, *H.M. Pfann & Co. v. J.C. Turner Cypress Lumber Co.*, 194 F. 69 (5th Cir. 1912) (holding in the closely related context of an output contract that a Florida lumber company had no obligation to honor a contract that gave buyer exclusive right to purchase all output from mill after lumber company sold the mill to a third party, and noting that an output contract could not be construed to "divest [the lumber company] of the right to dispose of their property in their own way and at any time deemed advantageous to themselves").

[15]To the extent Intertape argues that ITI's licensing agreement with Shurtape decreased ITI's requirements for tape and therefore amounted to conduct which was "detrimental" to Intertape, in breach of Section 9 of the Supply Agreement, the argument is without merit. ITI had no obligation to purchase any specific quantity of tape and Intertape has failed to adduce any evidence that ITI failed to purchase its requirements of tape as provided in its monthly forecasts to Intertape.

Shurtape is not a "contract for the manufacture, production, or purchase of identical Products" – it is an agreement that divests ITI of its exclusive right to manufacture Frog Tape in the United States, Canada and certain parts of Europe. (Doc. 58-9 at 1-20).

Upon review, therefore, Intertape's Motion will be denied as to Count I of the Complaint.

### B. Count II – Breach of the Covenant of Good Faith and Fair Dealing

In support of Count II, Intertape relies solely on ITI's putative breach of the "single source" provision in Section 1.2 of the Supply Agreement. (Doc. 41 at 12). As noted, *supra*, however, ITI did not breach Section 1.2 of the Supply Agreement by entering into the license agreement with Shurtape. Intertape has therefore failed to prove that ITI breached an express term of the contract and cannot recover on its claim for beach of the covenant of good faith and fair dealing. *Snow*, 896 So. 2d at 792.

Accordingly, Intertape's Motion will be denied as to Count II of the Complaint.

### V. Conclusion

For the foregoing reasons, it is **ORDERED** that Intertape's Motion for Partial Summary Judgment (Doc. 41) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July 14, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Parties

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE