**INTERTAPE POLYMER CORP.,**

        **Plaintiff-Counterdefendant,**

**-vs-**                                   **Case No. 6:09-cv-289-Orl-31GJK**

**INSPIRED TECHNOLOGIES, INC.,**

        **Defendant-Counterclaimant.**

_____

# ORDER

This matter came before the Court without oral argument upon consideration of Plaintiff-Counterdefendant's, Intertape Polymer Corporation ("Intertape"), Motion for Summary Judgment (the "Motion") (Doc. 43),[1] Defendant-Counterclaimant's, Inspired Technologies, Inc. ("ITI"), response in opposition thereto (Doc. 63) (the "Response"), and Intertape's reply (Doc. 66).

## I. Overview

The procedural history and general background of this case have been summarized in prior orders. (Docs. 29 and 71). In its instant Motion, Intertape contends that it is entitled to a judgment as a matter of law on Counts VIII, X, XI, XII, XIII, XIV and XV of ITI's Second Amended Counterclaim. (Doc. 43 at 1).

In Count VIII of its Second Amended Counterclaim, ITI asserts that Intertape violated Florida's Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201 *et seq*., by engaging in unfair competition and making false advertisements. (Doc. 40, ¶¶ 171-177). Count X asserts that Intertape violated the Lanham Act[2] by infringing ITI's trademarks. (Doc. 40, ¶¶ 186-205). Count

---

[1]Intertape also moved for partial summary judgment on Counts I and II of its Complaint. (Doc. 41). On July 14, 2010, the Court denied Intertape's Motion. (Doc. 71).

[2]*See* 15 U.S.C. § 1051 *et seq*. [hereinafter the "Lanham Act"].

XI asserts that Intertape violated the Lanham Act by engaging in unfair competition. (Doc. 40, ¶¶ 206-218). Count XII asserts that Intertape violated the Lanham Act by making false advertisements. (Doc. 40, ¶¶ 219-231). Count XIII asserts that Intertape violated Minnesota's Deceptive Trade Practices Act, MINN. STAT. § 325D.43 *et seq.*, by infringing ITI's trademarks and making false advertisements. (Doc. 40, ¶¶ 232-239). Count XIV asserts that Intertape violated Minnesota's Consumer Fraud Act, MINN. STAT. § 325F.68 *et seq.*, by misleading consumers. (Doc. 40, ¶¶ 240-246). Finally, Count XV asserts Florida and Minnesota common law claims for trademark infringement and unfair competition. (Doc. 40, ¶¶ 247-255).

The Court has jurisdiction pursuant to, *inter alia*, 28 U.S.C. §§ 1331, 1332 and 1367.

## II. Undisputed Facts[3]

### A. Intertape's Competing Product and Marketing

As the Court noted its prior Order, Intertape was the supplier of masking tape ITI used to manufacture "FrogTape," a green colored painter's tape product consisting of masking tape and ITI's patented "Paint Block"(hereinafter "PAINT BLOCK") – a polymer that, when applied to the edges of masking tape, absorbs paint to produce cleaner lines and edges (Doc. 71 at 1). Shortly after it agreed to act as ITI's tape supplier, Intertape began developing its own product: "Bloc-it," a bluish-teal colored painter's tape treated with "PST 16" polymer[4] (hereinafter "PST" or "PST 16"[5]).

_____

[3]Unless otherwise noted, the undisputed facts have been drawn from ITI's Response.

[4]There is no evidence that Intertape's PST 16 infringes ITI's patent for PAINT BLOCK.

[5]ITI contends that Intertape also referred to PST as "Paint Shock Technology" (Doc. 63 at 7, citing Krummen Dec., Ex. LLL, MMM, NNN and OOO). The Court has carefully reviewed the portions of the record to which ITI cites in its Response. Exhibits LLL, MMM and NNN make no

According to ITI, Intertape's research and development department knew from repeated testing that Bloc-it failed to outperform FrogTape. (Doc. 63 at 2-3). Specifically, on September 19, 2008, an internal Intertape memorandum noted that FrogTape outperformed Bloc-it on painted wallboard; on March 27, 2009, an internal Intertape email revealed "higher than normal paint bleed" with Bloc-it but noted that FrogTape continued to remain within "normal standard deviation;" on April 14, 2009, an Intertape internal study revealed that its sales force was getting "mixed results" with Bloc-it and that they could not "consistently demo the tape;" and on April 16, 2009, an independent testing agency concluded that competitors' products repeatedly outperformed Bloc-it. (Doc. 63 at 2-3).

Notwithstanding the foregoing, Intertape aggressively marketed Bloc-it. On January 29, 2009, for instance, Intertape made the following comparison during a presentation to executives at Lowe's (a nationwide home improvement retailer):

Best in Class – Product Performance

- How does [Bloc-it] stack up?
  – Frog Tape
  - Powder edge treated
    – Must be stored in special container
    – Subject to moisture contamination and product failure
  - Superior Fine Structure Crepe backing
  - Unique adhesive formulation
  - Good bleed resistance

---

reference to "Paint Shock Technology" whatsoever and exhibit OOO – an internal Intertape email from July 19, 2008 – stated that Intertape should not refer to their product "as 'paint block' as that terminology is trademarked by ITI." (Doc. 61-5 at 2). In short, ITI has not identified a single instance in which Intertape used the phrase "Paint Shock Technology." ITI's suggestion to the contrary is completely lacking in evidentiary support and deliberately misleading.

     – [Bloc-it]
-      Edge treated with PST 16
       – Not a powder - will not flake off
       >> Does not require special handling
-      Superior Fine Structure Crepe backing
-      Unique adhesive formulation
-      Industry leading bleed resistance

(Doc. 58-7 at 14).[6]

Other materials provided to, or designed for, retailers stated that Bloc-it "Solves paint bleed problem" and "allows for CLEAN EDGES Every time." (Doc. 61-2 at 2-3). Furthermore, on September 11, 2009, Intertape issued a press release to investors (among others) stating:

**NYSE SYMBOL: ITP**
**TSX SYMBOL: ITP**

**INTERTAPE POLYMER GROUP ROLLS OUT BLOC-IT[], A PREMIUM EDGE TREATED PAINTERS' MASKING TAPE**

**MONTREAL, QUEBEC AND BRADENTON, FLORIDA** (September 11, 2009) – [Intertape] is making life a whole lot easier for painters in paint line masking with the launch of its new Bloc-It[] ultra premium painters' tape. Painters now have Bloc-it[] masking tape as a choice they can count on for clean crisp paint lines every time.

"Not until recently has masking tape changed much at all," says James Apap Bologna, Vice-President of Consumer sales at [Intertape]. [Intertape]'s new Bloc-It[] Ultra Premium Masking Tape utilizes a proprietary chemistry, PST 16, on the edge of the tape which blocks paint, STOPS THE BLEED and ensures clean lines every time. This process is designed to enhance the already high standards of [Intertape's] masking tapes and deliver performance results not yet seen in a masking tape.

Bleed is one of the most common problems with painter's tape. Paint seeps under the tape's edge causing messy lines and uneven workmanship which results in the painter having to go back and touch up the rough spots with a brush. Bloc-It[]'s PST 16 technology solves the bleed-through problem.

---

[6]Intertape made similar presentations to other retailers, including: Home Depot, Do It Best, Orgill, Menards and Home Hardware. (Doc. 63 at 5). According to ITI, the presentations to Do It Best, Orgill, and Home Hardware "were successful" and led to sales of Bloc-it in 2009 that have continued in 2010. (Doc. 63 at 5).

"The PST 16 technology is completely absorbed into the paper to deliver a consistent performance," explained Apap Bologna, "promoting smooth, clean line [sic] with no bleed through. When the painter pulls the tape off the wall, the line is picture perfect, crisp and straight." Bloc-It[] has UV resistance for performance up to 14 days of direct sunlight and much longer when used indoors. . . .

Bloc-It[] incorporates [Intertape's] fine crepe paper that conforms easily around bends, corners and curves and is available in cut case packaging and free standing floor displays for easy customer access.

Bloc-It[] joins the already extensive line of ProMask[] tapes together with the wide range of packaging, duct and speciality tapes that complete the [Intertape] Consumer line.

**About Intertape Polymer Group**
Intertape Polymer Group is a recognized leader in the development and manufacture of specialized polyolefin plastic and paper based packaging products . . . .

**Safe Harbor Statement**
Certain statements and information included in this press release constitute forward-looking information within the meaning of applicable Canadian securities legislation and the Federal Private Securities Litigation Reform Act of 1995 . . . . While these statements are based on certain factors and assumptions which management considers to be reasonable based on information currently available to it, they may prove to be incorrect . . . .

(Doc. 61-3 at 2).

### B. The Parties' Marks

ITI has federally registered trademarks for "Frog Tape" (hereinafter "FROG TAPE")[7] and "Paint Block" (hereinafter "PAINT BLOCK"), Registration Nos. 3,245,314 and 3,234,253, respectively, and has been using same in commerce since November 21, 2006.[8] (Docs. 40-5 at 2 and 40-7 at 2). ITI also contends that it has common law rights to these registered marks and to the following frog design logo (which ITI used on, *inter alia*, its web site, product packaging, and company vehicles):

_____

[7]FROG TAPE is a word only – not a design – mark. Registration No. 3,245,314.

[8]ITI's first use of FROG TAPE and PAINT BLOCK occurred on June 6, 2004. (Docs. 40-5 at 2 and 40-7 at 2).



(Doc. 40-4 at 3).[9]

ITI also contends that it has common rights to the following "It WORKS" (hereinafter "IT WORKS") design mark (within which "IT" refers to Inspired Technologies, Inc. and "O" contains ITI's company logo):



(Doc. 40-4 at 2). Other than a picture of an ITI company vehicle bearing the IT WORKS design, ITI has not introduced any evidence of how it uses IT WORKS in connection with FrogTape or other ITI products.

---

[9]ITI, however, now appears to be using a slightly different logo on its web site and packaging:



*See* FROG TAPE, http://www.frogtape.com (last visited July 11, 2010).

On January 9, 2009, Intertape submitted an application to the U.S. Patent and Trademark Office for registration of the word and design mark "BLOC IT PAINTERS TAPE" (hereinafter "BLOC IT"). U.S. Trademark Application Serial No. 77,646,259; (Doc. 40-8 at 2).[10] On June 1, 2010, the mark was registered, Registration No. 3,796,838, and Intertape has been using same in commerce since March 31, 2009.[11] The design mark for "BLOC IT PAINTERS TAPE" consists of:[12]



Registration No. 3,796,838 (black and white image available on Westlaw's TradeMarkScan and at the USPTO); *also available at* BLOC-IT, http://www.bloc-it.com (last visited July 11, 2010).

In addition to the foregoing, on February 19, 2009, Intertape submitted an application to the U.S. Patent and Trademark Office for registration of the word and design mark "LILI LOW-ENVIRONMENTAL IMPACT LINE FROM INTERTAPE" (hereinafter the "LILI" mark). U.S. Trademark Application Serial No. 77,673,873; (Doc. 40-10 at 2). As of July 11, 2010, the application remained pending and had been published for opposition. The following comprises the design for the LILI mark:

---

[10]The U.S. Patent and Trademark Office considered ITI's PAINT BLOCK mark before certifying Intertape's BLOC IT mark for registration. *See* PTO'S TDR PORTLET, http://tmportal.uspto.gov/external/portal/tow?SRCH=Y&isSubmitted=true&details=&SELECT=US+Serial+No&TEXT=77646259#.

[11]Intertape's first use of "BLOC IT PAINTERS TAPE" also occurred on March 31, 2009.

[12]Intertape did not claim any particular color scheme as a feature of its mark.



(Doc. 40-10 at 22).[13]

      Intertape has never used the LILI mark in connection with Bloc-it.  As the text of the mark suggests, LILI is associated with Intertape's environmental stewardship program and, more particularly, a line of specially approved products sold by Intertape.  Bloc-it is not a part of Intertape's line of LILI products.  The only evidence of Intertape's use of the LILI mark consists of a page on Intertape's web site devoted to its "Green Initiative," *see* http://www.intertapepolymer. com/Products/Industrial/GreenInitiative/Pages/Default.aspx (last visited July 11, 2010), and as a part of the signature block on certain of Intertape's emails.[14]  (Doc. 61-7 at 2).

---

     [13]A color version of the LILI mark may be found on Intertape's web site.  *See* IPG'S GREEN INITIATIVE, http://www.intertapepolymer.com/Products/Industrial/GreenInitiative/ Pages/Default.aspx (last visited July 11, 2010).

     [14]Specifically, the following image was used below the signature block on Intertape emails:



(Doc. 61-7 at 2).

## III. Applicable Law

### A. Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

**B. Trademarks**

A trademark is defined to include "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 768 (1992); 15 U.S.C. § 1127. "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary. . . ." *Two Pesos, Inc.*, 505 U.S. at 768; *accord Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010) (citation omitted). "An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent [e.g. Kodak]. A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product [e.g., Penguin Refrigerators]. A descriptive mark identifies a characteristic or quality of the service or product [e.g., Vision Center]." *Caliber Automotive Liquidators, Inc.*, 605 F.3d at 938 (citations and quotations omitted); *see also Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Where a mark consists of both words and a design, the mark must be considered in its entirety; however, when comparing composite marks involving both designs and words, with the designs similar and the words different, the dominate feature (i.e., either the words or the design) is usually controlling in determining likelihood of confusion. 4 J.T. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:47 (4th ed. current through June 2010) [hereinafter "MCCARTHY"].

## IV. Discussion

The Court's analysis proceeds in two parts: in Part A, the Court addresses ITI's Lanham Act claims; in Part B, the Court addresses ITI's state law claims.

### A. ITI's Lanham Act Claims – Counts X, XI and XII

#### Count X – Federal Claim for Trademark Infringement[15]

In Count X of its Second Amended Counterclaim, ITI asserts that Intertape's use of BLOC IT, PST (or the phrase "Paint Shock Technology"[16]) and LILI infringe ITI's PAINT BLOCK, IT WORKS[17] and FROG TAPE (including ITI's frog design) marks, and was likely to cause confusion.[18] More precisely, ITI asserts that Intertape's BLOC IT and PST marks infringe ITI's

---

[15]Count X of ITI's Second Amended Counterclaim is clearly labeled "Count X – Trademark Infringement (Lanham Act § 32, 15 U.S.C. § 1114)." (Doc. 40 at 36). Accordingly, the analysis in Intertape's Motion focused on § 1114. (Doc. 43 at 5). In its Response, however, ITI inexplicably relied on 15 U.S.C. § 1125(a)(1)(A), which concerns, *inter alia*, false designation of origin – not 15 U.S.C. § 1114 – as the basis for its claims in Count X. (Doc. 63 at 14-15). Notwithstanding ITI's mistaken reliance on § 1125(a), both § 1114 and § 1125(a) are governed by the same likelihood of confusion test. *See Caliber Automotive Liquidators, Inc.*, 605 F.3d at 935, n.16.

[16]As noted, *supra*, ITI has produced no evidence that Intertape ever used the term "Paint Shock Technology."

[17]Count X does not actually allege that Intertape infringed ITI's IT WORKS mark. In their briefs, however, the parties' recognized the assertion of that claim. (Docs. 63 at 15-16 and 66 at 5-7). Although Count X references only to FROG TAPE, PAINT BLOCK and ITI's frog design, the Court will follow the parties' lead and countenance ITI's claim regarding the IT WORKS mark.

[18]Count X also asserts that Intertape sold defective masking tape – which ITI had rejected during the course of the parties' Supply Agreement – containing ITI's FROG TAPE mark and "Inspired Technologies" in their cores. (Doc. 40, ¶ 200). In its April 24, 2009 Order denying ITI's Motion for Preliminary Injunction, (Doc. 29), the Court found that ITI had failed to produce any competent evidence that Intertape ever sold defective tape (with or without the cores bearing ITI's mark and logo). (Doc. 29 at 9). In its Response, ITI does not address this portion of Count X or adduce any new evidence in support of same. Accordingly, the Court concludes that ITI has abandon this claim.

PAINT BLOCK and IT WORKS marks, and that Intertape's LILI mark infringes ITI's frog design mark.[19]  (Doc. 63 at 16-17).

To prevail on its infringement claim, ITI must show, *inter alia*, that: (1) it has valid trademarks;[20] and (2) Intertape "adopted an identical or similar mark such that consumers were likely to confuse the two."  *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003); *see also, e.g.*, *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1521-22 (11th Cir. 1991).  Intertape does not dispute that ITI has valid marks.[21]  (Doc. 43 at 5).  Accordingly, the only issue before the Court is confusion.

In assessing likelihood of confusion, courts within the Eleventh Circuit apply a weighted seven-factor balancing test that considers:  (1) the strength of mark; (2) similarity of marks; (3) similarity of the products the marks represent; (4) similarity of the parties' customers; (5) similarity of advertising media; (6) the alleged infringer's intent; and (7) actual confusion.  *Caliber Automotive Liquidators, Inc.*, 605 F.3d at 934-35; *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008); *see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972-73 (11th Cir. 1983).  "Of these, the [strength] of mark and the evidence of actual confusion

---

[19]Count X of ITI's Second Amended Counterclaim is at best ambiguous as to which of Intertape's marks infringe ITI's marks.  The Court, therefore, has looked to ITI's Response for clarification.  (Doc. 63 at 16-17).

[20]Under the Lanham Act, a plaintiff may recover even in the absence of federal trademark registration.  *Two Pesos, Inc.*, 505 U.S. at 768; *accord Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (citation and quotation omitted).  The same principles that qualify a mark for registration under the Lanham Act are generally applicable to determine whether an unregistered mark is entitled to protection under that act.  *Id.*

[21]In its Motion, Intertape omitted any analysis as to whether ITI had a protectable interest in its marks, or whether ITI's marks were inherently distinctive (or had attained secondary meaning).  The only issue presented in Intertape's Motion is whether there is a genuine issue of material fact as to likelihood of confusion.  (Doc. 43 at 5, "Intertape does not dispute that ITI has valid trademarks.  However, ITI fails to create a genuine issue of material fact as to . . . likelihood of confusion").

are the most important." *Aronowitz*, 513 F.3d at 1239 (citation and quotation omitted). Evidence of actual confusion by consumers, in particular, is the best evidence of likelihood of confusion.[22]

### 1. The Strength of ITI's Marks

As noted, *supra*, "[t]here are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary. The stronger the mark, the greater the scope of protection accorded it." *Id*. (citations and quotations omitted). To determine strength, courts look to both the words of the marks as well as to recognition of the mark in the marketplace. *See, e.g.*, *John H. Harland Co.*, 711 F.2d at 972-73 (11th Cir. 1983) ("The words of a mark are not . . . the sole factors determining its strength. Also important is . . . consumer recognition of the mark at issue") (citations and quotations omitted); *Aronowitz*, 513 F.3d at 1239 ("A mark's strength is enhanced where there is little or no third-party use of that mark") (citations and quotations omitted); 2 MCCARTHY § 11:83 (discussing two-pronged test for determining strength and noting that "[w]hile some courts have made the strong-weak evaluation solely upon the place of the term on the spectrum of marks, such an approach is incomplete. One must in addition look at the marketplace strength of the mark").

ITI contends – in a single paragraph in its Response – that all[23] of its marks are "suggestive" and that Intertape has failed to produce any evidence of third-party use. (Doc. 63 at 15). Intertape argues – albeit in no less a conclusory fashion – that ITI's marks are weak and that,

---

[22]*See Caliber Automotive Liquidators, Inc.*, 605 F.3d at 936 ("We have specified that '[a]ctual consumer confusion is the best evidence of likelihood of confusion. This circuit's caselaw makes plain that the customers of the relevant product or service, especially the mark holder's customers, turn the key") (citations and quotations omitted) (emphasis removed).

[23]ITI did not analyze the strength of any specific mark in its Response – it simply concluded that a "jury could find that [all of] ITI's marks are strong because they qualify as 'suggestive' . . . ." (Doc. 63 at 15).

inasmuch as ITI is the counterclaimant, Intertape does not have the burden of proving the strength of ITI's marks.  (Docs. 66 at 5 and 43 at 6).

The Court concludes that ITI's marks are comparatively weak.  As the counterclaimant, ITI bears the burden at trial of proving the strength of its marks.  Although ITI cannot be expected to prove a negative, *see*, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 286 ("courts have traditionally been reluctant to require a party to prove negatives such as the lack of knowledge"), the absence of third-party use is only one consideration in proving strength.  ITI must also offer some evidence (or, at the very least, some argument) as to why the words and designs in each of its marks are "suggestive" – and not merely descriptive – in referring to the qualities of ITI's products.  ITI has failed to do so.  More importantly, ITI has failed to produce evidence as to the strength of its marks in the marketplace.  Furthermore, even assuming that ITI's marks could be characterized as "suggestive," suggestive marks are generally considered to be comparatively weak.  *See*, *e.g.*, *John H. Harland Co.*, 711 F.2d at 874 ("A suggestive mark falls somewhere between [descriptive and arbitrary] and, although a suggestive mark can be protected without evidence that it has acquired secondary meaning, is comparatively weak").  Accordingly, the Court concludes that ITI's marks are comparatively weak.

## 2. Similarity of Marks

The similarity of marks is determined by considering the overall impression created by the marks as a whole rather than simply comparing individual features of the marks and includes a comparison of the appearance, sound and meaning of the marks, as well as the manner in which the marks are used.  *See*, *e.g.*, *Frehling Enters., Inc.*, 192 F.3d at 1337; *John H. Harland Co.*, 711 F.2d 966 (citing, *inter alia*, MᴄCᴀʀᴛʜʏ);

ITI makes the following argument in its Response about the similarity of the parties' marks:

The appearance, sound, meaning, and manner in which Intertape's marks and ITI's marks are used are very similar. . . . Intertape . . . referred to its technology as "Paint Shock Technology." In other words, Intertape merely changed the name from "Paint Block" to "Paint Shock" to try and circumvent a known infringement problem with ITI's PAINT BLOCK[] trademark. Intertape's 'Paint Shock' Technology is confusingly similar to ITI's "PAINT BLOCK[]" brand and trademark associated with anti-leaking technology. . . .

Intertape's unauthorized "BLOC-it" name is highly similar to ITI's "PAINT BLOCK[]" and "It WORKS[]" trademarks and brands. Intertape merely combined the second word from "PAINT BLOCK[]" with the first word in "It WORKS" to derive Intertape's "BLOCK-It" name.

Intertape's frog image is also substantially similar to ITI's Frog design . . . [and includes] a "tree hugging" side profile of the frog.

(Doc. 63 at 16-17) (citations omitted). The Court disagrees.

With respect to Intertape's BLOC IT mark, there is no evidence whatsoever that Intertape ever used the phrase "Paint Shock Technology" and the argument that Intertape simply combined the second word in PAINT BLOCK with the first word in IT WORKS to create BLOC IT is fantastic. Intertape uses BLOC IT as the name of its product, while ITI uses PAINT BLOCK as merely a description of the technology that goes into its product. If retailers or end-consumers were to compare the two packaged products side-by-side, they would be faced with a choice between Bloc-It with PST 16 and FrogTape with PAINT BLOCK – not "Paint Shock" versus "Paint Block." Furthermore, while by no means dispositive, BLOC IT and PAINT BLOCK are both federally registered marks and the U.S. Patent and Trademark Office considered ITI's PAINT BLOCK mark before registering Intertape's BLOC IT mark.

With respect to Intertape's LILI mark and ITI's frog design (i.e., ITI's prior frog design – not the frog design which ITI currently uses on its web site and product packaging), there is clearly some similarity in the frogs that appear in both marks. Arguably, though, the dominant feature in Intertape's LILI mark consists of the letters "Lili" (with lily pads as tittles) and the phrase "Low-environmental impact line from intertape" – not the side-profile of the frog clinging to the letter

"L." (Doc. 40-10 at 22). In any event, ITI has not offered any evidence tending to suggest that Intertape's LILI mark has been used in connection with "Bloc-It." On the contrary, the record demonstrates that Intertape's LILI mark has nothing to do with Bloc-It or FrogTape.

Accordingly, the Court concludes that there is little similarity between Intertape's and ITI's marks.

### 3. Similarity of Products Represented by the Marks

Bloc-it with PST and FrogTape are functionally similar products. However, Bloc-it is represented by BLOC IT and PST; FrogTape is represented by FROG TAPE and PAINT BLOCK (other than its display on company vehicles, IT WORKS does not represent FrogTape). There is no evidence that Intertape's LILI mark represents Bloc-it. Furthermore, Bloc-it is a bluish-teal product and FrogTape is green (the colors of the two products are clearly different).

### 4. Similarity of the Parties' Customers

Intertape apparently concedes that the parties have similar customers[24] and there is substantial evidence that Bloc-it and FrogTape compete head-to-head for the same retail outlets and end-consumers.

### 5. Similarity of Advertising

Intertape concedes that the parties have similar advertising and sales methods. (Doc. 43 at 7).

### 6. Intertape's Intent

The intent factor focuses on the alleged infringer's subjective intent to deliberately derive a benefit from the plaintiff's business reputation, or the extent to which the infringer was

---

[24]Intertape's Motion does not address this factor.

intentionally blind to the adoption of a confusingly similar mark. *See Frehling Enters., Inc.*, 192 F.3d at 1340; *John H. Harland Co.*, 711 F.2d at 977.

ITI has failed to offer substantial evidence of Intertape's intent to capitalize on ITI's marks or to turn a blind eye to same. Although Intertape deliberately created and promoted a product that competes directly with FrogTape, there is no evidence that the marks associated with Bloc-it were meant to capitalize on ITI's reputation or that Intertape was intentionally blind to the adoption of a confusingly similar mark.

## 7. Actual Confusion

ITI has failed to offer any relevant evidence of actual confusion. Other than an inapposite string cite to evidence having no bearing on the extent to which Intertape used ITI's marks (or similar marks) to promote Bloc-it, ITI's Response fails to discuss a single instance where a retailer or end-consumer expressed any confusion related to the parties' marks. *See* 4 MᴄCᴀʀᴛʜʏ § 23:13 (noting that evidence of actual confusion must be evidence of confusion caused by the parties' marks).

## Balance of Factors

In balancing the foregoing factors, the Court concludes that ITI has failed to present a triable issue of fact as to likelihood of confusion. As to the most weighty factors, the strength of ITI's marks is comparatively weak and there is no evidence of actual confusion. Although there is similarity in the parties' products (at least as to function), customers and advertising methods, the remaining factors favor Intertape

In short, there is insufficient evidence that relevant consumers are (or were) likely to believe that Intertape's products are in some way affiliated with ITI. See *Midway Servs., Inc.*, 508 F.3d at 650 (noting that after district court's balance the *Frehling* factors, the "ultimate question

remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way") (citation and quotation omitted).

Accordingly, Intertape is entitled to a judgment as a matter of law as to Count X.

### Count XI – Federal Claim for Unfair Competition

In Count XI, ITI asserts that Intertape violated 15 U.S.C. § 1125(a)(1)(A) by engaging in unfair competition. Inasmuch as likelihood of confusion is an essential element to a claim of unfair competition under § 1125(a), *see, e.g.*, *Caliber Automotive Liquidators, Inc.*, 605 F.3d at 935, n.16, Intertape is entitled to a judgment as a matter of law on Count XI.

### Count XII – Federal Claim for False Advertising[25]

In Count XII, ITI asserts that Intertape violated 15 U.S.C. § 1125(a)(1)(B)[26] by making false commercial advertisements.

---

[25]Although it is not entirely clear that ITI has prudential standing to assert a claim for false advertising under the Lanham Act, *see, e.g.*, *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325 (11th Cir. 2008); *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1168 (11th Cir. 2007) (holding, *inter alia*, that direct competitors did not have standing to assert false advertising claim under Lanham Act where there was only attenuated link between false advertising statements and harm), Intertape did not address this issue.

[26]In pertinent part, § 1125(a)(1)(B) provides:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . .

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

To prevail on a false advertising claim under the Lanham Act, a plaintiff must establish that: (1) the defendant's advertisements were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been injured as a result of the false advertising. *See, e.g., North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1224 (11th Cir. 2008); *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1261 (11th Cir. 2004). An advertisement is "false" if it is literally false; an advertisement is "misleading" if it may literally be true (or is ambiguous) but implicitly conveys a false impression, is misleading in context, or is likely to deceive consumers. *Hickson Corp.*, 357 F.3d at 1261. If an advertisement is not literally false, then the plaintiff must demonstrate that consumers were actually deceived. *Johnson & Johnson Vison Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002); *see also Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1346-47 (M.D. Fla. 2006). Finally, statements amounting to an opinion or "puffery" are generally not actionable under § 1125(a). 5 MCCARTHY § 27:38 ("Advertising claims that fall in the category of "puffing" are considered not to constitute false advertising and are not in violation of the Lanham Act. This gives advertisers considerable leeway in drafting [advertisements and reflects a policy choice] . . . allowing the free market to hold advertisers and manufacturers accountable for their statements, ensuring vigorous competition and protecting legitimate commercial speech") (citations and quotations omitted); *see also, e.g., BellSouth Advertising & Pub. Corp. v. Lambert Pub.*, 45 F. Supp. 2d 1316, 1320 (S.D. Ala. 1999) (noting, *inter alia*, that subjective claims of product superiority are non-actionable puffery); *Univ. of Fla. Research Found., Inc. v. Orthovita, Inc.*, Case No. 1:96-cv-82, 1998 WL 34007129 (N.D. Fla. 1998).

In its Response, ITI asserts that Intertape made false[27] statements in its advertisements, in particular, that Bloc-it:

- "Featuring [sic] technologically [sic] superior to *ANY* performance masking tape available today" (as stated in the presentation Intertape gave to Lowes on January 29, 2009) (Doc. 58-7 at 12);

- had "Best In Class – Product Performance" (also from Lowes presentation) (Doc. 58-7 at 14);

- had "Industry leading bleed resistance" while FrogTape had "Good bleed resistance" (also from Lowes presentation) (Doc. 58-7 at 14);[28]

- "Solves paint bleed problem" (from undated marketing literature targeted to retailers) (Doc. 61-2 at 4);

- "Features NEW Technology that allows for CLEAN EDGES Every Time" (from same undated marketing literature) (Doc. 61-2 at 3);

- "[U]tilizes a proprietary chemistry, PST 16, on the edge of the tape which blocks paint, STOPS THE BLEED and ensures clean lines every time. This process is designed to enhance the already high standards of IPG's masking tapes and deliver performance results not yet seen in a masking tape" (from September 11, 2009 press release announcing roll out of Bloc-it) (Doc. 61-3 at 2);

- had "PST 16 Technology" which "solves the bleed-through problem" (from same September 11, 2009 press release) (Doc. 61-3 at 2); and

- had "PST 16 Technology" which according to Intertape executive Apap Bologna would "deliver a consistent performance promoting smooth, clean line [sic] with no bleed through. When the painter pulls the tape off the wall, the line is picture

---

[27] In its Response, ITI does not contend that Intertape's statements were misleading – it simply contends that the statements were false. (Doc. 63 at 11). In any event, ITI has not presented any evidence of actual deception by consumers. To preclude summary judgment, then, ITI must demonstrate, *inter alia*, that there is a genuine issue of material fact as to the literal falsity of Intertape's advertising.

[28] In passing, the Court notes that Intertape's statements to Lowes were likely not "commercial advertisements" within the meaning of 15 U.S.C. § 1125(a)(1)(B). *See First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803 (7th Cir. 2001) (observing that, for purposes of 15 U.S.C. § 1125(a)(1)(B), "commercial advertising or promotion" means "promotion to anonymous recipients, as distinguished from face-to-face communication"). For purposes of this Order, however, the Court assumes that Intertape's statements to Lowes and other retailers are actionable under § 1125(a).

perfect, crisp and straight" (from same September 11, 2009 press release) (Doc. 61-3 at 2).

(Doc. 63 at 11).

In its Motion, Intertape makes two arguments concerning Count XII. First, Intertape contends that none of the foregoing statements are literally false and that ITI has offered little or no evidence as to their falsity. Second, it contends that ITI has failed to produce any evidence that Intertape's advertisements had a material effect on consumers' purchasing decisions. (Doc. 43 at 14).

Upon review, the Court concludes that the statements identified by ITI are not literally false, have not been shown to be false by record evidence, or amount to puffery. Even assuming, *arguendo*, however, that some of the statements are literally false and do not amount to puffery, ITI has failed to adduce evidence tending to show that Intertape's statements had a material effect on consumers' purchasing decisions.

The first statement that ITI relies upon – "Featuring [sic] technologically [sic] superior to . . ." – is, at most, ambiguous puffery. As a grammatical matter, it is not even clear what this statement was meant to convey (e.g., that Bloc-it "featured technology superior to . . ." or that Bloc-it's "features were technologically superior to. . ."). In any event, the statement would be literally false only if there were evidence demonstrating that the *technology* (or *features*) in Bloc-it were not, in fact, superior to the technology found in any other "performance masking tape" (what constitutes "performance masking tape" is also ambiguous – it is unclear, for instance, whether that phrase includes only edge-treated tapes such as Bloc-it and FrogTape or also includes untreated tapes). ITI has not produced evidence concerning the inferiority of Bloc-it's technology or features.

The statement "Best In Class – Product Performance" was used in connection with *both* Bloc-it and FrogTape (the phrase appears at the top of a page comparing various attributes of both products). (Doc. 58-7 at 14). "Class" is an inherently ambiguous term that is frequently used in advertising. Here, it is unclear whether "class" refers to some edge-treated tapes; all edge-treated tapes; some untreated tapes; or all "performance masking tapes" – treated or untreated. Even assuming, however, that "class" includes only Bloc-it and FrogTape, both are described as "Best" and neither product is characterized as being superior to the other.

The statements concerning Bloc-it's "Industry leading bleed resistance" and FrogTape's "Good bleed resistance" are not literally false. While Intertape's performance tests appear to have revealed that competitors' products were (at one time, at least) outperforming Bloc-it,[29] "industry leading" is classic puffery and, similar to the term "class," invites significant ambiguity as to, *inter alia*, the breadth of the "industry" to which the statement refers. As for FrogTape's "good bleed resistance," that statement is, at a minimum, literally true. While ITI's product may certainly be more than "good," phrases such as "good" are indeterminate expressions of opinion. *See* 5 MCCARTHY § 27:38. Finally, even if both statements taken together convey the message that Bloc-it has bleed resistance that is "better than" FrogTape's bleed resistance, that statement is not a specific, measurable claim that can be reasonably interpreted as an objective fact and is therefore puffery. *Id.*

---

[29]Inasmuch as Intertape never made reference to any performance tests (or for that matter, any other sort of "proof") in its advertising, its performance tests are arguably of no moment. *See, e.g., Univ. of Fla. Research Found.*, at *27 ("[U]nless a claim that a product is 'better' than a competitor's is 'backed-up' with false allegations that 'tests prove' superiority when no such tests or only unreliable tests exists to support such a claim, [a] superiority claim constitutes no more than unactionable puffery. For non-puffing superiority claims, an affirmative showing that the claim is false is required, i.e. a showing that defendant's product is equal or inferior") (citations omitted).

The remaining statements upon which ITI relies are also not literally false, have not been shown to be false by record evidence, or amount to puffery. "Featuring NEW Technology that allows for CLEAN EDGES Every Time," for instance, is not false – Bloc-it certainly has "new technology" and any masking tape, depending on the skill of the painter, type of paint, surface, etc., could arguably "allow for clean edges every time." Furthermore, ITI has not offered any evidence that Bloc-it, *inter alia*, does not contain technology that "allows" for clean edges; fails to "solve" or "stop" bleed resistance; or does not "promote" smooth lines. Finally, statements to the effect of "delivering performance results not yet seen" in competing products or "[W]hen the painter pulls the tape off the wall, the line is picture perfect, crisp and straight" are puffery or opinion.

Even assuming, however, that some (or even all) of Intertape's advertising statements were literally false, ITI has not shown that any of these statements had a material effect on consumers' purchasing decisions. ITI does not appear to even address this element of its claim in its Response; the closest it comes to producing evidence of an effect on consumers' purchasing decisions is that Intertape sold Bloc-it in 2009, continues to sell Bloc-it in 2010, and has damaged ITI through these sales. (Doc. 63 at 5-6 and 9). Sales of Bloc-it – without more – are not evidence from which a factfinder could find that Intertape's false advertising had a material effect on retailers' or end-consumers' purchasing decisions. ITI must offer some evidence that Intertape's advertisements falsely "misrepresented an inherent quality or characteristic of the product" that was relevant to consumers' purchasing decisions. *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1250 (citations and quotations omitted). It has failed to do so.

Accordingly, Intertape is entitled to a judgment as a matter of law on Count XII.

**B. ITI's State Law Claims – Counts VIII, XIII, XIV and XV**

ITI concedes that its Florida and Minnesota statutory claims (Counts VIII, XIII and XIV) are predicated on the same conduct required to support its Lanham Act claim for false advertising, (Doc. 63 at 12-14), and that its remaining Florida and Minnesota common law claims (Count XV) "essentially mirror[]" its Lanham Act claims. (Doc. 63 at 19).

Inasmuch as ITI's Lanham Act claims for trademark infringement, unfair competition and false advertising fail, as a matter of law, ITI's state law claims necessarily fail as well. *See, e.g.*, *Natural Answers, Inc.*, 529 at 1332-33; *Planetary Motion, Inc. v. Techsplosin, Inc.*, 261 F.3d 1188, 1193 n.4 (11th Cir. 2001); *Investacorp, Inc.*, 931 F.2d at 1521; *accord Fair Isaac Corp. v. Experian Information Solutions, Inc.*, 645 F. Supp. 2d 734, 756 (D. Minn. 2009); *Rainbow Play Sys., Inc. v. GroundScape Techs., LLC*, 364 F. Supp. 2d 1026, 1038-39 (D. Minn. 2005).

Accordingly, Intertape is entitled to a judgment as a matter of law on Counts VIII, XIII, XIV and XV.

**V. Conclusion**

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that:

1. Plaintiff-Counterdefendant Intertape Polymer Corporation's Motion for Summary Judgment (Doc. 43) is **GRANTED**; and

2. Plaintiff-Counterdefendant Intertape Polymer Corporation is entitled to a judgment as a matter of law on Counts VIII, X, XI, XII, XIII, XIV and XV of Defendant-Counterclaimant's Second Amended Counterclaim.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 14, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE